UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

AUTOMATED MANAGEMENT
SYSTEMS, INC.,

        Plaintiff,

    -v-                               No.   1:16-CV-04762-LTS-KNF

RAPPAPORT HERTZ CHERSON
ROSENTHAL, P.C., WILLIAM
RAPPAPORT, STEVEN M. HERTZ, ELIOT
J. CHERSON, MICHAEL C. ROSENTHAL,
BRANK RAKAMARIC, and BEN
WACHTER,

        Defendants.

-------------------------------------------------------x

## Memorandum Opinion and Order

       Plaintiff Automated Management Systems, Inc. ("AMSI" or "Plaintiff") brings

this action against Defendants Rappaport Hertz Cherson Rosenthal, P.C. ("RHCR"), RHCR's

four named partners William Rappaport, Steven M. Hertz, Eliot Cherson, and Michael C.

Rosenthal (collectively, the "Law Firm Defendants"), Branko Rakamaric ("Rakamaric"), and

Ben Wachter ("Wachter") (collectively, the "Defendants"), asserting claims for copyright

infringement, trade secret misappropriation under 18 U.S.C. section 1836 (the Defend Trade

Secrets Act, or "DTSA") and under common law, unfair competition, breach of contract (against

the Law Firm Defendants), and tortious interference with a contract (against Defendants

Rakamaric and Wachter).  The Court has jurisdiction of Plaintiff's federal copyright

infringement and DTSA claims pursuant to 28 U.S.C. sections 1331 and 1338 and has

supplemental jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. section 1367.

Defendants have moved for summary judgment as to all claims (see docket entry no. 217), to seal confidential business records (see docket entry no. 215), and for the Court to set aside or modify a July 14, 2021, order issued by Magistrate Judge Fox granting, in part, Plaintiff's motion for sanctions.  (See docket entry nos. 276, 277, 282, and 287.)  Plaintiff has moved for adjournment or denial of the Law Firm Defendants' summary judgment motion pursuant to Federal Rule of Civil Procedure 56(d) (see docket entry no. 233), to seal confidential business records (see id.), and for leave to move for partial summary judgment as to Plaintiff's breach of contract claim only, despite the deadline to do so having already expired.  (See docket entry no. 290.)

The Court has carefully considered all the parties' submissions.  For the reasons explained below, the Court has reached the following decisions.  Defendants' summary judgment motion is denied on all counts.  Defendants' motion to seal is denied without prejudice to renewal.  Plaintiff's motion to seal is denied without prejudice to renewal.  Plaintiff's Federal Rule of Civil Procedure Rule 56(d) motion to adjourn or deny Defendants' motion for summary judgment is denied as moot.[1]  Defendants' request to set aside the July 14, 2021, order is denied in its entirety.  Plaintiff's request for leave to move for partial summary judgment beyond the deadline set forth in Federal Rule of Civil Procedure 56(b) is granted.

## BACKGROUND

AMSI is a New York corporation that makes and licenses software products (see docket entry no. 170 ("Third Amended Complaint" or "TAC") ¶ 1), including a program called

---

[1]    AMSI sought the adjournment or denial of Defendants' motion for summary judgment because, at time of filing, Defendants had not complied with a discovery order issued against them by Magistrate Judge Fox.  (See docket entry no. 232.)  Because the Court denies Defendants' motion on its merits, Plaintiff's Rule 56(d) motion is denied as moot.

the Landlord Tenant Legal System ("LTLS" or the "AMSI Software"), which AMSI licensed to RHCR, a landlord-tenant law firm, pursuant to a Software Subscription Agreement entered into on January 2, 2007.  (See TAC at Exhibit C (the "Agreement").)  The LTLS is registered with the U.S. Copyright Office under registration number TX 7-232-319, as a work titled "Landlord & Tenant Legal System" that was completed in 2007 and first published on November 1, 2007. (TAC ¶ 6 Exhibit A (the "LTLS Copyright").)  The software that was installed in 2007 replaced a prior software system that was registered with the U.S. Copyright Office under registration number TX 7-232-302.  (TAC ¶ 8 at Exhibit B.)  Registration TX 7-232-302 is for a work titled "L&T Legal System" that was completed in 1998 and first published on September 1, 1998. (TAC at Exhibit B (the "L&T Copyright").)  AMSI asserts that, "to the extent that copyrightable elements of the prior software were incorporated into" the 2007 Software, they continue to be protected by the L&T Copyright.  (TAC ¶ 8.)  The LTLS Copyright and the L&T Copyright were both registered on September 3, 2010.  (TAC at Exhibits A & B.)

   The Agreement and License granted thereunder to RHCR remained in force through 2015, at which point the AMSI Software began to crash and freeze routinely, causing processing delays at RHCR.  (See docket entry no. 222 ("Def. SOF") ¶ 10.)  Around that time, RHCR contacted Rakamaric, a computer programmer, regarding installation of a new software platform (the "Rakamaric Software") to replace the AMSI Software, and an agreement to that effect was signed on October 1, 2015.  (Def. SOF ¶¶ 12-14.)  To help install the Rakamaric Software, Rakamaric retained Defendant Wachter, and he and Wachter were provided by the Law Firm Defendants with a server location entitled RHCR-APPSRV to conduct the development and installation of their program.  (Id. ¶ 27.)  RHCR did not notify AMSI of this

new agreement, and its Agreement with AMSI remained active.  (See docket entry no. 237 ("Pl. SOF Response") ¶ 12.)

On May 13, 2016, RHCR asked AMSI to remedy a problem with the AMSI Software.  (Def. SOF ¶ 51.)  On May 27, while conducting this repair work, James Traina, AMSI's President, found the RHCR-APPSRV server containing the Rakamaric Software and, AMSI claims, thousands of files copied from the AMSI Software by Rakamaric and Wachter with permission from the Law Firm Defendants.  (See docket entry no. 235 ("Traina Dec.") ¶ 121.)  On June 6, 2016, AMSI cut off RHCR's access to the AMSI Software, including a database containing information pertaining to RHCR clients.  (Def. SOF ¶ 53.)  On June 13, 2016, RHCR filed an action for a preliminary injunction against AMSI in New York state Supreme Court, claiming that AMSI's shutdown of RHCR's access to the AMSI Software was preventing RHCR from accessing client information necessary to continue operating its business.  (Def. SOF ¶ 55.)  The injunction application was denied (see Pl. SOF Response ¶ 55), and AMSI commenced this lawsuit on June 21, 2016.  (Def. SOF ¶ 56.)  On September 25, 2019, AMSI filed its Third Amended Complaint, adding Ben Wachter as a defendant.  (TAC at 1.)  The TAC remains the operative complaint in this action.

The AMSI Software and the Rakamaric Software are primarily written in different programming languages (see Pl. SOF Response ¶¶ 15, 16), but perform many of the same functions.  (See Pl. SOF Response ¶ 110.)  AMSI alleges, and Defendants deny, that Rakamaric and Wachter achieved much of this functionality by studying the proprietary source code and sub-components of the AMSI Software that had allegedly been copied to the RHCR-APPSRV server and then using this proprietary information to effectively duplicate the AMSI Software in another coding language.  (TAC ¶¶ 44, 45.)  AMSI alleges, and the Law Firm

Defendants deny, that the Law Firm Defendants gave Rakamaric and Wachter "unfettered access" to AMSI's Software to facilitate this duplication.  (Traina Dec. ¶ 12.)

   To clarify which functions AMSI believes have been duplicated, AMSI has filed an "Itemized List of Disputed Portions" specifying the portions of its Software it claims were duplicated by Defendants.  (See docket entry no. 206 ("Katz Dec") at Exhibit D ("Itemized List of Disputed Portions" or "ILDP").)  This list can be summarized as including three general areas or functions: the "alert" or automatic email function (the "Email Alerts"), the "maintenance" or data entry function (the "Maintenance Screens") and the "data dictionary," which explains the structure of the AMSI Software database ("Data Dictionary").  (Def. SOF ¶ 111.)  AMSI's Email Alerts generate various reports and alerts and email them to selected recipients automatically.  (Pl. SOF Response ¶ 110(a).)  This function is achieved via two main programs: a triggering program, which can be activated based on various events, and a selection criteria program, which searches for and obtains all data needed to populate an email alert based on certain criteria.  (Id. ¶ 110(a)(vi).)  AMSI's ILDP identifies 15 "Email Alerts" that can be generated by the Software as needed, notifying the user of, inter alia, an upcoming trial, the status of a warrant, and the scheduling of an eviction.  (ILDP at 2-5.)  Also contained within the Email Alerts category are two subsystems, the "Expired Rent Demands and Expired Petitions System" and the "Trials Subsystem" (the "Two Subsystems"), that combine E-mail Alerts with other features, such as creation of relevant legal documents or management of an interactive web interface.  (ILDP at 3-4.)  AMSI claims that no competitor had this type of automatic e-mail alert function prior to its alleged appropriation by Rakamaric.  (Pl. SOF Response ¶ 110(a)(iii).)  As to 14 of the 15 Alerts and the Two Subsystems, Defendants do not dispute that the Rakamaric Software performs a

"comparable" function, but they maintain that the code and "fundamental architecture" of the softwares are different. (Def. SOF ¶¶ 110(a)(v), 110(b)(iii).)

The Maintenance Screens function category is comprised of screens that house and display basic client and case file data to the RHCR user terminal. (Def. SOF ¶ 122.) Screens within this category include a "Landlord Maintenance Screen," a "Client Maintenance Screen," and a "Court Appearance Maintenance Screen," among others. (ILDP at 5.)

A Data Dictionary is an inventory of data elements or variables contained within a database that defines each data element, describes its data type, and explains in plain English what the element is. (Traina Dec. ¶ 82.) AMSI describes the Data Dictionary as "a major blueprint of AMSI's LTLS Software." (Traina Dec. ¶ 84.) AMSI has admitted that the database schemas in the Rakamaric Software are "different" from those in the AMSI Software[2] and does not dispute that the two programs are written in different languages (see, e.g., Traina Dec. ¶ 52), but claims that the Rakamaric Software "appropriates substantial portions of the database structure" of the AMSI Software. (See, e.g., Pl. SOF Response ¶ 106.) Defendants dispute any allegation that Rakamaric and Wachter appropriated the AMSI Software's database structure, maintaining instead that Rakamaric and Wachter only accessed RHCR client and business data stored within the AMSI Software and claiming that the designs of the two databases are "fundamentally different." (See Def. SOF ¶¶ 107, 139.)

---

[2]     AMSI failed to timely respond to Defendants' requests for admission and are therefore deemed to have admitted, inter alia, that "AMSI's software licensed to Law Firm Defendants and Defendant Rakamaric's software at issue in this litigation utilize different database schemas"; that "AMSI's software licensed to the Law Firm Defendants does not use stored procedure architecture for the main program functionality"; and that "Defendant Rakamaric's software at issue in this litigation does use stored procedure architecture for the main program functionality." (See docket entry no. 232, at 14.)

In August 2019, AMSI served discovery requests for production of then-current "operational versions of the . . . Rakamaric Software and the contents of the server named 'RHCR-APPSRV,'" claiming that the information contained therein would provide necessary evidence that Defendants had engaged in actionable copying of the AMSI Software.  (See docket entry no. 262.)  As of July 9, 2020, Defendants had failed to comply with these requests, leading Magistrate Judge Fox to issue an order directing that:

1) the defendants shall provide the plaintiff operational versions of [the Rakamaric] software;
2) the defendants shall provide access to [the RHCR-APPSRV] server, as soon as practicable; [and]
3) the defendants shall supplement their response to the plaintiff's request for communications exchanged by defendants relating, inter-alia, to landlord-tenant law practice management software[.]

(See docket entry no. 196, at 1.)  On August 25, 2020, having not yet complied with the order, the Law Firm Defendants, via letter motion, requested a protective order preventing inspection of the RHCR-APPSRV server, claiming that "discovery of Law Firm Defendants' computer system" was "unnecessary and unduly burdensome."  (Docket entry no. 197.)  On September 2, 2020, the motion was denied.  (See docket entry no. 199.)  On September 29, 2020, the Law Firm Defendants again moved for a protective order and to quash a subpoena served by Plaintiff upon Krantz Secure Technologies ("Krantz"), a service provider retained by RHCR that housed backup copies of the Server.  (See docket entry no. 207.)  This motion was denied by the Court on January 12, 2021.  (See docket entry no. 232.)

On February 18, 2021, having still not received the discovery at issue, AMSI moved for sanctions against all Defendants.  (See docket entry no. 262.)  On July 14, 2021, Judge Fox granted AMSI's motion in part, awarding AMSI:

(1) the reasonable attorney's fees and costs associated with obtaining the server and software via subpoena from Krantz;

(2) the reasonable attorney's fees incurred by AMSI in opposing the
motion for a protective order and to quash, which appears at Docket
Entry No. 207;

(3) the reasonable attorney's fees incurred by AMSI in preparing the letter
motion that appears at Docket Entry No. 245; and

(4) the reasonable attorney's fees and costs incurred by AMSI in
connection with the instant motion.

(Docket entry no. 274, the "Order", at 20-21.)

On August 26, 2021, Plaintiff requested via letter motion leave from the Court to

move for summary judgment as to Plaintiff's "second claim for relief for breach of contract"

against the Law Firm Defendants, despite the deadline to do so having already expired.  (See

docket entry no. 290; see also TAC ¶¶ 69-73.)  Discovery closed on Oct. 5, 2021.  (See docket

entry no. 203.)

<u>DISCUSSION</u>

<u>Motion for Summary Judgment</u>

Summary judgment is to be granted in favor of a moving party if "the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is considered material if it "might

affect the outcome of the suit under the governing law," and an issue of fact is a genuine one

where "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  To defeat a summary judgment motion, the

nonmoving party "must do more than simply show that there is some metaphysical doubt as to

the material facts." Caladora v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (citation omitted).

The nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead

must offer some hard evidence showing that its version of the events is not wholly fanciful."

Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted).

### Count 1: Copyright Infringement

Defendants move for summary judgment as to Plaintiff's claim of copyright infringement on five distinct grounds.  First, Defendants argue that many of the program components allegedly infringed are "generic," "obvious," and "rudimentary," and therefore cannot be copyrighted.  (See docket entry no. 221 ("Def. Mem.") at 2.)  Second, Defendants argue that, even if these components can be copyrighted, there is no substantial similarity between the AMSI Software and the Rakamaric Software and, therefore, comparison of the two programs cannot support an inference of copying.  (Def. Mem. at 14.)  In the event that Defendants are not entitled to summary judgment as to substantial similarity, they advance three arguments as to why the inferred copying cannot lead to liability for infringement.  First, Defendants argue that they can present a valid defense against liability under the Fair Use Doctrine.  (Def. Mem. at 27.)  Second, Defendants argue that, even if copying is found to have occurred, the copying is not actionable because it falls within the Essential Step Exception.  (Def. Mem. at 21.)  Third, Defendants argue that, even if copying is found to have occurred and does not fall within the Essential Step Exception, it is not actionable under the Maintenance and Repair Exception.  (Def. Mem. at 25.)  The Court will consider each of these arguments in turn.

### Copyrightability of AMSI Software

Copyright law does not protect "ideas," but protects only their expression.  17 U.S.C. § 102(b); see also Mattel, Inc. v. Goldberger Doll Mfg. Co., 365 F.3d 133, 135-36 (2d

Cir. 2004).   When "'a given idea is inseparably tied to a particular expression' so that 'there is a 'merger' of idea and expression,' courts may deny protection to the expression 'in order to avoid conferring a monopoly on the idea to which it inseparably is tied.'"   Hayuk v. Starbucks Corporation, 157 F. Supp. 3d 285, 289-90 (S.D.N.Y. Jan. 12, 2016) (quoting Mannion v. Coors Brewing Co., 377 F. Supp. 2d 444, 455-56 (S.D.N.Y. Jul. 21, 2005)).   Drawing a line between an idea and the expression of an idea is notoriously difficult.   "Obviously, no principle can be stated as to when an imitator has gone beyond copying the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be ad hoc."   Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960).

This process is further complicated when evaluating a computer program, which "combines creative and technical expression."   Computer Assocs. Int'l v. Altai, Inc., 982 F.2d 693, 704 (2d Cir. 1992) ("Computer Assocs.") (internal citation and quotation marks omitted). Copying of a computer program can be divided into literal copying (that is, copying of the source code, akin to copying the text of a work of literature) and non-literal copying of non-code elements of a program, such as program flow charts, the specific organization of inter-modular relationships, and macros.   See id. at 702.   To distinguish copyrightable from non-copyrightable material in cases alleging non-literal copying of a computer program, the Second Circuit employs a two-step analysis: abstraction and filtration.[3]   Id. at 706-07.

Because AMSI alleges non-literal copying, the Court applies the Computer Assocs. framework, beginning its analysis with abstraction.   At the abstraction stage, the Court must "dissect the allegedly copied program's structure and isolate each level of abstraction

---

[3]      The commonly cited third step in this process, comparison, is used to evaluate "substantial similarity" between two programs.   See Computer Assocs., 982 F.2d at 710-11; see also infra at 11.

within it." Id. at 707.  However, "in cases where 'the copyright holder presents the court with a list of features that it believes to be protectable . . . the court need not abstract further such features.'" O.P. Solutions, Inc. v. Intellectual Property Network, Ltd., No. 96-CV-7952-LAP, 1999 WL 47191, at *7 (S.D.N.Y. Feb. 2, 1999) ("O.P. Solutions") (quoting Mitek Holdings, Inc. v. Arce Engineering Co., Inc., 89 F.3d 1548, 1555 (11th Cir. 1996) ("Mitek")); see also Softel Inc. v. Dragon Medical and Scientific Comm., Inc., 118 F.3d 955, 969 n. 9 (2d Cir. 1997) (citing Mitek approvingly and noting that a court applying the Computer Assocs. framework need only "analyze evidence properly brought before it by a party").  Here, the Plaintiff's ILDP obviates the need for abstraction analysis by the Court.  O.P. Solutions, 1999 WL 47191, at *7.  The Court will instead take the three conceptual categories of the AMSI Software specified by the ILDP (Email Alerts, Other Features (referred to by Defendants and in this Order as "Maintenance Screens"), and the Data Dictionary) and proceed to the second analytical step: filtration.

At the filtration stage, the Court separates protectable expression from non-protectable material by:

> examining the structural components at each level of abstraction to determine whether their particular inclusion at that level was "idea" or was dictated by considerations of efficiency, so as to be necessarily incidental to that idea; required by factors external to the program itself; or taken from the public domain and hence is non-protectable expression. The structure of any given program may reflect some, all, or none of these considerations. Each case requires its own fact specific investigation.

Computer Assocs., 982 F.2d at 707 (internal citation omitted).  The goal of the filtration step is to "sift[] out all elements of the allegedly infringed program which are 'ideas' or are dictated by efficiency or external factors, or taken from the public domain" in order to locate a "core of protectable expression." Id. at 710.

Defendants argue that none of the three categories should be considered copyrightable material, claiming that "organizing a database by clients and tenants or issuing reminders for upcoming court conferences . . . would occur in any logical iteration of the general functions of law firm management software." (Def. Mem. at 14.) Defendants correctly posit that the idea of a database or an email alert is certainly not subject to copyright protection, but they mischaracterize the substance of the disputed portions claimed by Plaintiff as copyrightable.

AMSI argues that the Email Alerts are protectable as a compilation of seventeen original works (the Email Alerts and the Two Subsystems). Under copyright law, a compilation is defined as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C.A. § 101 (Westlaw current through 117-80). This principle holds even when the work comprising the compilation has previously been copyrighted by others. See Caffey v. Cook, 409 F. Supp. 2d 484, 497 (S.D.N.Y. Jan. 18, 2006) ("Caffey") (finding that the organization of 32 pre-existing songs into an original compilation was protectable and could be infringed). "So long as the compiler of material . . . has exercised 'some minimal level of creativity' in the selection process, he is entitled to a copyright in that selection." Id. at 497 (quoting Silverstein v. Penguin Putnam, Inc., 368 F.3d 77, 83 (2d Cir. 2004)). As the Caffey Court found that "Caffey selected and ordered the thirty-two songs from a universe of possible musical compositions based on his sense of musicality, the audience's familiarity with the songs, the physical demands of performance, and the suggestions of the defendants . . .", Caffey, 409 F. Supp. 2d at 497, a reasonable jury could find that AMSI, in designing the AMSI Software, selected and ordered the E-mail Alerts from a "universe" of possibilities and demonstrated "some minimum level of creativity" in so doing.

Defendants' arguments regarding AMSI's Data Dictionary, which outlines its database structure, conflate the idea of a database (and a Dictionary describing it) with AMSI's specific expression of this idea.  While the idea of arranging data into a database cannot be subject to a monopoly, the unique design of a particular database can be copyrightable material: "[i]f [an infringing party] said to itself, '[plaintiff's database] is a nifty way of sorting real estate data and we want . . . their data in the form in which it is organized in the database, that is, sorted into [plaintiff]'s 456 fields grouped into its 34 tables,' and the [non-owning party in possession of the database] obliged, they would be infringing [plaintiff]'s copyright." Assessment Technologies of WI, LLC v. WIREdata, Inc., 350 F.3d 640, 643 (7th Cir. 2003).  AMSI proffers that its Data Dictionary describes the unique structure of its database, which arranges 2,213 types of data into 51 different tables and is "entirely original to AMSI."  (Traina Dec. ¶¶ 80, 81.)  This proffer rebuts Defendants' conclusory assertion that the Data Dictionary falls into a category of material that "cannot be copyrighted under applicable law."  (Def. Mem. at 21.)

Regarding the Maintenance Screens, Defendants do not put forward any argument that the Maintenance Screens are not copyrightable, instead basing their arguments entirely on the question of substantial similarity.  Therefore, the Court finds that, as to copyrightability of the Maintenance Screens, Defendants have not demonstrated that they are entitled to judgment as a matter of law.

Defendants' conclusory assertions that the E-Mail Alerts and Data Dictionary are not copyrightable do not, without more, meet Defendants' burden of demonstrating that no reasonable jury could find otherwise.  Defendants' summary judgment motion is therefore denied to the extent it seeks a determination that AMSI's software features are not copyrightable.

Substantial Similarity

"In any suit for copyright infringement, the plaintiff must establish its ownership

of a valid copyright, and that the defendant copied the copyrighted work." Computer Assocs. ,

982 F.2d at 701.  "Plaintiff may prove defendant's copying by either direct evidence or, as is

most often the case, by showing that (1) the defendant had access to the plaintiff's copyrighted

work and (2) that defendant's work is substantially similar to the plaintiff's copyrightable

material." Id. at 701.  The question of substantial similarity makes up the third step of the

Computer Assocs. analytical framework.

Id. 710.  In general, "[w]orks are substantially similar if an 'ordinary observer, unless he set out

to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as

the same.'" Croak v. Saatchi & Saatchi, North America, Inc., 174 F. Supp. 3d 829, 834

(S.D.N.Y. March 31, 2016) (quoting Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 111 (2d

Cir. 2001)).  However, the ordinary observer standard has been called into question in evaluating

claims of infringement of computer programs, which often involve "highly complicated and

technical subject matter . . . that are likely to be somewhat impenetrable to lay observers—

whether they be judges or juries . . ." and therefore may require expert testimony for substantial

similarity to be evaluated accurately.  See Computer Assocs., 982 F.2d at 713.

Substantial similarity "is customarily an extremely close question of fact."

Sturdza v. United Arab Emirates, 281 F.3d 1287, 1295 (D.C. Cir. 2002).  For this reason,

"summary judgment has traditionally been frowned upon" in copyright litigation.  Hoehling v.

Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980).  However, in certain

circumstances, it is "entirely appropriate for a district court to resolve that question as a matter of

law, 'either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.'" <u>Peter F. Gaito Architecture, LLC v. Simone Development Corp.</u>, 602 F.3d 57, 63 (2d Cir. 2010) (quoting <u>Warner Bros. Inc. v. Am. Broad. Cos.</u>, 720 F.2d 231, 240 (2d Cir. 1983)).

Access is not in dispute in this case.  Law Firm Defendants possessed a license allowing them access to the AMSI Software (<u>see</u> Agreement at 2), and Defendants, though asserting that "neither Rakamaric nor Wachter looked at the AMSI Software code" (Def. Mem. at 7), stipulate that, at a minimum, development and installation of the Rakamaric Software involved extracting client data "embedded in AMSI Software's FoxPro language."  <u>Id.</u>

As to substantial similarity, the Court finds that Plaintiff AMSI has proffered sufficient evidence to enable a reasonable jury, viewing the evidentiary record in the light most favorable to AMSI, to find substantial similarity between the Email Alert, Maintenance Screen, and Data Dictionary and database structure of the two programs.  First, the admissions imputed to Plaintiff for failure to timely respond to Defendants' RFAs do not, as Defendants contend, foreclose a finding of substantial similarity.  (<u>See</u> docket entry no. 246 ("Def. Reply") at 2.)  The admissions imputed to AMSI cited by Defendants regarding substantial similarity include admissions that the two programs use different code and different database schemas.  (Katz Dec. at Exhibit 4, "Requests for Admission".)  However, neither of these admissions is dispositive. First, that two programs are written in different languages does not preclude a finding of substantial similarity.  "[W]hile the difference in programming languages is relevant to the issue of infringement, the simple fact that the accused work is in a different language does not in itself defeat plaintiff's claim because a copyright affords its holder the exclusive right, among others,

to produce derivative works." Tradescape.com v. Shivaram, 77 F. Supp. 2d 408, 413 (S.D.N.Y. Dec. 13, 1999) ("Tradescape.com").  Second, a finding that two programs are not exactly the same does not foreclose a finding of substantial similarity.  Id. at 408.  Indeed, a derivative work is, by definition, not exactly the same as the work from which it is derived, see 17 U.S.C.A. § 101 (Westlaw current through P.L. 117-80) (defining a "derivative work" as "a work based upon one or more preexisting works"), and creation of an unauthorized derivative work is an enumerated basis for a finding of copyright infringement under federal law.  See 17 U.S.C. § 106(2).

Regarding the E-mail Alerts, Defendants fail to offer evidence disputing Plaintiff's proffer that the Rakamaric Software duplicates AMSI's "entire collection" of 15 Email Alerts (Pl. SOF Response ¶ 110(a)(i)), and replicates the functionality of the Two Subsystems (Pl. SOF Response ¶¶ 110(b)(iv), 110(iii)).  On the contrary, Defendants concede that the Rakamaric Software "performs a function comparable to the AMSI Software alerts" (Def. SOF ¶ 110(a)(iii)), "accomplishes a comparable task" to that accomplished by AMSI's Expired Rent Demands and Expired Petition Subsystem (Def. SOF ¶ 110(b)(iii)), and includes a function comparable to that of AMSI's Trials Subsystem as "part of the general notice generation system."  (Def. SOF ¶ 110(c)(i).)

Defendants' affirmative arguments for lack of similarity between the two programs' Email Alert functions rely on conclusory assertions of "fundamental difference."  (See Def. SOF ¶ 110(a)(v-vi)) ("[C]omparing the code of the email alert features of the program, it is clear that they are fundamentally different."); (see also 110(b)(iv)) ("The two programs are fundamentally different.")  In support of these claims, Defendants emphasize the difference in coding languages and "generic" nature of the AMSI Software.  (See, e.g., Def. Mem. at 12.)  As

explained above, such differences are insufficient to establish that Defendants are entitled to judgment dismissing Plaintiff's claims.

Further, while Defendants proffer screenshots of the "Upcoming Trial" Email Alert for both programs to demonstrate the purported difference between the two (Def. Mem. at 15), Defendants provide no response to Plaintiff's claim that the design of the Rakamaric Software's Upcoming Trial Email Alert was modified during litigation to conceal similarity between the two programs.  (See Pl. SOF Response ¶ 113.)  In support of its contention, Plaintiff has proffered a screenshot of the Rakamaric Software's Email Alert prior to the alleged modification, which bears a much stronger similarity to its AMSI equivalent.  (See Traina Dec. ¶ 27 at Ex. 4F.)  In so proffering, Plaintiff AMSI raises a genuine issue of fact material to the question of substantial similarity at the time of the alleged infringement.  The Court must therefore deny Defendant's motion for summary judgment as to the substantial similarity of the two programs' Email Alert components.

Defendants' claim for summary judgment as to the Maintenance Screens similarly emphasizes visual difference, difference in coding language, and difference in source code.  As noted above, that two programs do not share literal code or even the same coding language does not defeat a plaintiff's claim to infringement.  See Tradescape.com, 77 F. Supp. 2d at 413. While visual difference is relevant to the inquiry, Defendants concede that the information conveyed by both screens is "comparable" and do not contradict AMSI's contention that the Rakamaric Software's maintenance programs "perform exactly the same functions and produce exactly the same outputs" as AMSI's LTLS Software.  Instead, Defendants assert that "the presentation and organization of the two programs are very different."  (Def. SOF ¶ 110(d)(iv).) To support this argument, Defendants proffer screenshots of the "Court Maintenance Screen,"

"Landlord Maintenance Screen," and "Client Maintenance Screen" for both programs.  (Def. Mem. at 17-20.)  Indeed, these screens, as seen in the screenshots proffered by Defendant, do appear visually different.  However, AMSI also proffers what it contends are screenshots of both programs' Maintenance Screens in which the screens appear nearly identical (Traina Dec. ¶ 102 at Exhibits 14-B, 14C), raising a genuine issue of material fact as to which screens are the proper bases for analysis.  Further, Defendants fail to dispute AMSI's separate theory of copying of the Maintenance Screens, namely that Rakamaric upgraded his software's maintenance screens by copying elements of the Maintenance Screens created by AMSI.  (See Traina Dec. ¶¶ 104-109.) AMSI supports this argument by providing screenshots of the Rakamaric Software as it purportedly existed in October 2015 (before Rakamaric was allegedly granted access to the AMSI Software by Law Firm Defendants) and in June 2016 (after).  Id.  Accompanying the screenshots are lists specifically enumerating each element of the AMSI Maintenance Screens that was allegedly added to the Rakamaric Maintenance Screens during the period in which Rakamaric had access to the AMSI Software.  Having so proffered, AMSI has demonstrated both the existence of a genuine issue of material fact and the possibility that a reasonable jury, construing all facts in the light most favorable to AMSI, could find the Maintenance Screens of the two programs to be substantially similar.  Defendants' request for summary judgment as to the substantial similarity of the Maintenance Screens is denied.

Regarding the Data Dictionary and the database structure that it describes, Defendants put forward three arguments for summary judgment.  Defendants' first argument, that the admission imputed to Plaintiff that the two programs use different database schema (see Requests for Admission ¶ 20), mandates summary judgment, fails.  As noted above, an admission of difference does not foreclose a finding at trial as to substantial similarity or that a

given work may be derivative of another.  See Tradescape.com, 77 F. Supp. 2d at 413.  Second,

Defendants argue that, because the Rakamaric Software "does not utilize a 'data dictionary' as

such, it is impossible for Mr. Rakamaric to have copied it."  (Def. Mem. at 21.)  This argument is

unresponsive to Defendants' claim that Rakamaric "cop[ied] AMSI's database structure as

disclosed by AMSI's Data Dictionary," allowing Rakamaric to undertake "copying of database

tables, data elements, and replication of various features and functions."  (See docket entry no.

244 ("Pl. Mem.") at 15) (emphasis added).  Put another way, this assertion, even if true, does not

resolve the question of whether AMSI's Data Dictionary was unlawfully used by Defendants in

the development of the Rakamaric Software.  Third, Defendants assert that comparison of the

databases in the two programs "demonstrates a fundamentally different design."  (Def. Mem. at

21.)  In support of this assertion, Defendants cite to their own Rule 56.1 statement, which

similarly asserts conclusorily that "[c]omparison of the Rakamaric database schema, which

performs a comparable function as the 'data dictionary' demonstrates a fundamentally different

design."  (Def. SOF ¶ 139.)  Plaintiff rebuts this assertion with substantial evidence in support of

its claim of substantial similarity, including the appearance in both databases of tables containing

the same sets of variables, identified by nearly identical names, and used for the same purpose.

(See, e.g., Traina Dec. ¶¶ 86, 89, 90.)   In one table, used to determine amounts to be included in

rent arrears, the Rakamaric Software uses variable names almost identical to those used in the

AMSI Software to store the same information, altering the name only by adding a "p" to the title

of each variable.  (Id. ¶ 86.)  In another table, relating to Opposing Counsel information, the

Rakamaric Software's table stores the same data in the same order as in the AMSI Software,

differing from the AMSI Software only in the addition of "op" to the name of each variable.  (Id.

¶ 91.)  Such similarities can support an inference of copying, despite an absence of identical

source code.  See CMAX/Cleveland, Inc. v. UCR, Inc., 804 F. Supp. 337, 354-57 (M.D. Ga.

1992).  Defendants' argument that no reasonable jury could find substantial similarity between

the database structures of the two programs is unavailing, and Defendants' request for summary

judgment as to the substantial similarity of the programs' databases is denied.


Fair Use

Defendants argue that, even if the AMSI Software is copyrightable and the

Rakamaric Software is substantially similar to it, Defendants' actions amount to "intermediate

copying," allowing Defendants to avail themselves of the defense provided by the Fair Use

Doctrine.  The Fair Use Doctrine permits copying of copyrighted materials under certain

circumstances, to be determined by considering four factors: (1) the purpose and character of the

use, including whether such use is of a commercial nature or is for nonprofit educational

purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion

used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the

potential market for or value of the copyrighted work.  See 17 U.S.C.A. § 107 (Westlaw current

through P.L. 117-80).  Fair Use is a defense against an otherwise valid claim of copyright

infringement.  Sega Enterprises Ltd. v. Accolade, Inc., 977 F.2d 1510, 1521 (9th Cir. 1992).  The

statutory factors are not exclusive; the doctrine of fair use is an "equitable rule of reason."

Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 560 (1985) (citation

omitted).

Defendants' Fair Use claim fails because it is unresponsive to the theory, and

supporting evidentiary proffers, put forward by Plaintiff in support of its claim for infringement.

In arguing that Fair Use applies, Defendants claim that any copying of the AMSI Software was

done purely to facilitate the extraction of raw RHCR client data from the AMSI database. (Def. Mem. at 27-28.)  In so doing, Defendants seek to analogize the situation presented here to those in two cases, Sega Enterprises Ltd. v. Accolade, Inc., 977 F.2d 1510 (9th Cir. 1992) ("Sega"), and Assessment Technologies of Wisconsin, LLC v. WIREdata, Inc., 350 F. 3d 640 (7th Cir. 2003) ("WIREdata").  In Sega, the Court found that defendants' copying and disassembling of copyrighted portions of a Sega video game to access unprotected elements within it for the purpose of making new games compatible with the Sega system was defensible "intermediate copying" under the Fair Use Doctrine.  Sega, 977 F. 2d at 1527.  In so finding, the Court heavily weighed the "purpose and character" of the Defendants' copying, which the district court determined was done "solely in order to discover the functional requirements for compatibility with the Genesis console—aspects of Sega's programs that are not protected by copyright."  Id. at 1522.  WIREdata endorses a similar principle.  In WIREdata, plaintiff Assessment Technologies of Wisconsin ("AT") stored public, unprotected real estate data gathered by various Wisconsin municipalities in its proprietary database and sought to use the proprietary nature of the database to prevent defendant WIREdata from accessing the uncopyrightable public data contained therein.  WIREdata, 350 F.3d at 642.  Having ruled for WIREdata, the Court noted in dicta that "even if the raw data were so entangled with [AT's proprietary database] that they could not be extracted without making a copy of the program," this copying would be protected by the Fair Use Doctrine.  Id. at 644-45.

WIREdata and Sega are unsupportive of Defendants' claim to protection under the Fair Use Doctrine for two reasons.  First, for purposes of summary judgment, the Court has already found that AMSI has proffered sufficient evidence from which a reasonable jury could find that Defendants committed copying beyond that deemed permissible by the Sega and

WIREdata Courts, foreclosing a grant of summary judgment for Defendants on the basis of Fair

Use.  (See supra at 18.)  Defendants' claim to the Fair Use defense in reliance on Sega and

WIREdata requires a factual predicate in which Rakamaric and Wachter only engaged in

"intermediate copying," the copying of AMSI Software solely for the purpose of extracting the

raw client data contained within the AMSI database.  See Sega, 977 F.2d 1510, 1527.  Because

the Court has found that Plaintiff advances a theory of infringement, sufficient to survive

summary judgment, based not on "intermediate copying," but on the unlawful appropriation of

proprietary elements of its program by a competitor seeking to create a derivative work, the Fair

Use Doctrine is not a preclusive defense entitling Defendants to summary judgment on the

current record.  Second, WIREdata grounds its decision in the doctrine of misuse, which

"prevents copyright holders from leveraging their limited monopoly to allow them to control

areas outside the monopoly."  WIREdata, 350 F.3d at 647 (quoting A&M Records, Inc. v.

Napster, Inc., 239 F.3d 1004, 1026-27 (9th Cir. 2001)).  Both cases permit "intermediate

copying" in circumstances where the allegedly infringing party had no means of accessing the

unprotected data encased in the proprietary material other than copying the protected material.

See Sega, 977 F.2d at 1527; see also WIREdata, 350 F.3d at 645.  Here, there is a genuine

factual dispute as to whether the Law Firm Defendants had to copy the AMSI Software in order

to retrieve their own client data contained within the AMSI database.  AMSI maintains that it

never refused to provide the Law Firm Defendants with the law firm data and that the Law Firm

Defendants "never asked for the data."  (Pl. Mem. at 25.)  The Law Firm Defendants argue that

AMSI's decision on June 6, 2016, to cut off RHCR's access to its database "made it impossible

for RHCR to access its client data."  (Def. Mem. at 8.)

Plaintiff has therefore met its burden as the nonmoving party to demonstrate both the existence of a genuine dispute of material fact and that there is evidence from which a reasonable jury, imputing all inferences in Plaintiff's favor, could determine that Defendants' actions are not protected by the Fair Use Doctrine.  The Court therefore denies Defendants' motion for summary judgment on the basis of the Fair Use Doctrine.

## The Essential Step Exception

Defendants next argue that they are entitled to summary judgment on Plaintiff's copyright infringement claim because their actions fall within the Essential Step Exception and are therefore non-actionable.  (See Def. Mem. at 21; see also 17 U.S.C. § 117(a)(1) (Westlaw current through P.L. 117-80).)  The statutory Essential Step Exception provides that:

> Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another computer program or adaptation of that computer program provided . . . that such a new copy is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner.

17 U.S.C.A. § 117(a)(1) (Westlaw current through P.L. 117-80).  The Essential Step Act functions as a "safe harbor," rendering otherwise actionable activity immune from liability for copyright infringement.  To come within the protection of this section, Defendants must demonstrate that the Rakamaric Software was a new copy or adaptation of the AMSI Software "(i) made by the owner of a copy of [the] computer program"; (ii) was "created as an essential step in the utilization of the computer program in conjunction with a machine"; and (iii) was "used in no other manner."  See Krause v. Titleserv, Inc., 402 F.3d 119, 122 (2d Cir. 2005).

This Court finds that the Essential Step Exception does not support summary judgment for Defendants for several reasons.  First, the cases on which Defendants rely consider

claims for infringement based on the modification of existing programs, rather than allegations of appropriation of a program's features for incorporation into the program of a competitor.  In Krause v. Titleserv, 402 F.3d 119 (2d Cir. 2005) ("Titleserv"), Plaintiff Krause performed IT work for Defendant Titleserv and wrote numerous programs for the company.  Titleserv, 402 F.3d at 120.  After the acrimonious termination of the relationship between the two parties, Krause left executable versions of his code and gave Titleserv permission to use it, but forbade Titleserv from modifying the code in any way.  Id. at 121.  Because an inability to modify the code would render it useless (preventing registration of new customers, for example), Titleserv modified the code in four ways: (1) correcting programming errors; (2) changing the source code to add new clients and update client information; (3) incorporating the programs into a new operating system; and (4) adding new functions, such as the ability to print checks.  Id. at 125. In Aymes v. Bonelli, 47 F.3d 23 (2d Cir. 1995) ("Aymes II"), a second case cited by Defendants, the Court held that modifications made to programs designed to assist with inventory, record-keeping, and sales functions of a retail chain were protected by the Essential Step Exception because the modifications were made to keep the programs up-to-date and ensure their compatibility with successive generations of Defendant's computer systems.  Id. at 26.  The Aymes II Court so held because the "adaptations were essential to allow use of the program[s] for the very purpose for which [they were] purchased."  Id. at 27.  Both courts grounded their findings that the Essential Step Exception applied on conclusions that the modifications in question facilitated effective use of the programs for the purpose from which the programs were purchased—a principle clearly inapposite to the instant case, in which the Law Firm Defendants sought not to upgrade the AMSI Software, but to replace it.

Defendants' reliance on Universal Instruments Corp. v Micro Sys. Engineering, Inc., 924 F.3d 32 (2d Cir. 2019) ("Universal Instruments"), is similarly misplaced.  In Universal Instruments, a company (analogous to RHCR) contracted with a competitor (analogous to Rakamaric) of the Plaintiff (analogous to AMSI) to optimize equipment the company had purchased from the Plaintiff as part of a multi-phase development process.  Id. at 37.  In seeking to analogize Universal Instruments to the case at hand, Defendants emphasize that the adaptations considered therein, and ultimately found to be permissible, were, as here, implemented by one of Plaintiff's competitors.  However, the dispositive issue in Universal Instruments was not the identity of the allegedly infringing party, but the nature of that party's use of the infringing product.  Common to all three cases is a determination that the Essential Step Exception permits the upgrading of an existing product to further that product's use by a lawful purchaser, not to further that product's replacement with that of a competitor.  See id. at 38-39.

Second, as Defendants themselves point out, Titleserv clearly limits use of the Essential Step Exception to instances in which the copyright proprietor's interests are not harmed, stating:

> that the safe harbor of §117(a) could 'only be exercised so long as they did not harm the interests of the copyright proprietor . . . A different scenario would be presented if [the user's] alteration somehow interfered with [the copyright owner's] access to, or ability to exploit, the copyrighted work that he authored, or if the altered copy of Krause's work were to be marketed by the owner of the copy.'

(Def. Mem. at 23) (quoting Titleserv, 402 F.3d at 129).  In claiming that they have met this requirement, Defendants argue that they "have not interfered in any way with AMSI's rights to reap the benefit of its authorship" (Def. Mem. at 23), but their position finds no support in the factual record.  Rakamaric is a direct competitor of AMSI, having replaced AMSI as the

software provider at both RHCR and at another landlord-tenant law firm in 2010. (See docket entry no. 216 ("Rakamaric Dec.") ¶ 4-8.) Permitting Rakamaric access to AMSI's proprietary software for the purpose of replacing it with the Rakamaric Software could be found by a reasonable jury to constitute interference with AMSI's enjoyment of the benefits of its copyright.

For these reasons, and considering the facts in the light most favorable to the non-moving party, the Court finds that a reasonable jury could conclude that the Essential Step Exception does not apply to the copying that allegedly took place in this case. Defendants' motion for summary judgment is therefore denied to the extent it is based on the Essential Step Exception.

Maintenance and Repair Exception

Defendants' final argument, that they are entitled to summary judgment because Defendants' actions are protected by the "Maintenance and Repair Exception" under 17 U.S.C. section 117, is unavailing. The maintenance and repair exception provides that otherwise infringing copying is not actionable if:

> such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine, if (1) such new copy is used in no other manner and is destroyed immediately after the maintenance or repair is completed; and (2) with respect to any computer program or part thereof that is not necessary for that machine to be activated, such program or part thereof is not accessed or used other than to make such new copy by virtue of activation of the machine.

17 U.S.C.A. § 117(c) (Westlaw current through P.L. 117-80). In seeking the protection of this subsection, Defendants claim that the "Law Firm Defendants retained Mr. Rakamaric to update their computer system . . . The aim of the conversion was to repair and update the computer system at RHCR, which had been prone to shutdowns and crashes." (Def. Mem. at 27.) The

factual record belies these assertions.  RHCR, by all accounts, did not retain Rakamaric to make

a copy of the AMSI software such that RHCR's machines could be maintained or repaired.

RHCR retained Rakamaric to install a new software program that would replace the AMSI

Software, and allegedly permitted Rakamaric to copy the AMSI Software to facilitate that

replacement.  Defendants' purpose does not fall within the Exception's ambit.  Defendants'

motion for summary judgment on the theory that Defendants' conduct is protected by the

Maintenance and Repair Exception is denied.


Count 2: Misappropriation of Trade Secrets

The Defend Trade Secrets Act (DTSA) provides a federal cause of action for

"[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product

or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. §

1836(b)(1) (Westlaw current through P.L. 117-80).  A trade secret is "any formula, pattern,

device or compilation of information which is used in one's business, and which gives him an

opportunity to obtain an advantage over competitors who do not know or use it."  Deutsche Bank

Securities, Inc. v. Rhodes, 578 F. Supp. 2d 652 (S.D.N.Y. Sept. 29, 2008).   Further, a trade

secret must be concealed from competitors and the general public.  See Moody v. Morris, 608 F.

Supp. 2d 575, 581 (S.D.N.Y. Apr. 13, 2009) ("[O]nce an idea is disseminated publicly, it cannot

be considered a trade secret as a trade secret must be used secretly and continuously in

commerce.") (internal quotations and citation omitted).  To sustain a claim for misappropriation

of a trade secret, a claimant must demonstrate that the defendant used, or is using, the trade

secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper

means.  Deutsche Bank Securities, 578 F. Supp. 2d 652, 664-65 (S.D.N.Y. Sept. 29, 2008)

(citation omitted).  To bring this claim under the DTSA, the claimant must also show that the trade secret is "related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1) (Westlaw current through P.L. 117-80).

      Interpreting the record in the light most favorable to AMSI, a reasonable jury could find that the source code and object code underlying the AMSI Software each constitute a trade secret, meaning that both sets of code constitute proprietary works that are used in AMSI's business and are designed to confer a competitive advantage over other competitors in the field. (See, e.g., Traina Dec. ¶ 30) ("AMSI's unique Email Alert Subsystem . . . gave AMSI a significant advantage over all its competitors . . .").  Plaintiff has also met its burden to demonstrate misappropriation, as the record contains sufficient evidence to survive summary judgment for claims of copyright infringement.

      Defendants argue that Plaintiff's DTSA claim cannot survive summary judgment because Plaintiff has not met its burden, even with all inferences resolved in Plaintiff's favor, to demonstrate that a reasonable jury could find that their trade secrets are used in, or were intended for use in, interstate or foreign commerce.  (Def. Mem. at 29-30.)  Plaintiff proffers two arguments to the contrary.  First, Plaintiff argues that the AMSI Software's Email Alerts, though concerning matters taking place in New York, are often sent to clients and law firm staff located outside of state of New York, and that AMSI Software is therefore used in interstate commerce. (Traina Dec. ¶ 160 n. 22); cf. Yager v. Vignieri, 2017 WL 4574487, at *2 (S.D.N.Y. Oct. 12, 2017) ("At least some of Dr. Yager's patients travel from New Jersey into New York to use his services, and therefore those services are used in interstate commerce.").  Second, Plaintiff contends that, in 2015, Law Firm Defendants sought to enter into a business venture with ClickNotices, a Maryland-based business that provided case management services to landlords,

in which ClickNotices would acquire AMSI Software and gain access to AMSI's client base in partnership with RHCR.  (Traina Dec. ¶ 155-57.)  Plaintiff contends further that, in support of this venture, the Law Firm Defendants "disclosed confidential operational . . . information of [the AMSI Software] to ClickNotices."  (Id. at ¶ 158.)  Defendants dispute these claims, asserting that the extent of RHCR's relationship with ClickNotices was representation of a property management company, C&C Management, that ClickNotices referred to them.  (Docket entry no. 248 ¶¶ 3-6.)  Defendant Rappaport asserts further that "neither RHCR nor I entered into any written agreement with ClickNotices."  (Docket entry no. 249 ¶ 4.)  However, Defendants do not rebut Plaintiff's claims that RHCR discussed a venture with ClickNotices involving its acquisition of AMSI and AMSI's Software, raising a genuine issue of material fact as to whether RHCR intended to use the AMSI Software (and the trade secrets contained therein) in a multi-state venture with ClickNotices, thereby using AMSI's trade secrets in interstate commerce.  Because a genuine issue of material fact remains as to this third element of Plaintiff's DTSA claims, the Court finds that Plaintiff is not entitled to summary judgment, and Plaintiff's motion is therefore denied as to Count 2.

Counts 3-6: State Law Claims

Defendants argue that the remaining state law claims put forward by Plaintiff may be dismissed for lack of jurisdiction if the Court grants summary judgment as to AMSI's claims arising under federal law.  Defendants' motion for summary judgment is denied; accordingly, the predicate for the Court's exercise of supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. section 1367 remains present.  Defendants' motion for summary judgment dismissing Plaintiff's state law claims for lack of jurisdiction is therefore denied.

The Parties' Motions to Seal

Plaintiff has filed a motion for leave to file the declaration of James Traina (docket entry no. 235) under seal and to file their memoranda of law in opposition to Defendants' motion for summary judgment under seal pending redactions.  (Docket entry no. 244.)  Plaintiff's memorandum in support of their motion proffers that the material to be sealed contains confidential business data and software code which the parties had agreed to file under seal under a negotiated protective order approved by Magistrate Judge Fox (see docket entry no. 192), but does not specifically explain why the information should be sealed from public view, other than cursorily proffering that sealed filing is warranted because the material contained therein is confidential business information.

Defendants have also filed a motion for leave to file certain documents under seal, specifically the exhibits attached to the affidavit of Defendant Rakamaric.  (See docket entry no. 215.)  Like Plaintiffs, Defendants offer only cursory statements that the material to be sealed contains confidential business data and software code, which the parties have agreed to submit under seal to the court.  Defendants do not specifically justify why the information should be sealed from public view.

The public has a "general right to inspect and copy public records and documents, including judicial records and documents."  Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 598 (1978) (footnotes omitted).  The weight given to the presumption of public access is determined by "the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts."  United States v. Amodeo, 71 F.3d 1044, 1049 (2d Cir. 1995) ("Amodeo II").  Once determined, the weight of the presumption is balanced against competing interests, which "include but are not limited to 'the danger of

impairing law enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.'" Lugosch v. Pyramid Co. of Onondago, 435 F.3d 110, 120 (2d Cir. 2006) (quoting Amodeo II, 71 F.3d at 1049).

In addition to the common law right of access, the public has a First Amendment right of access to judicial documents, a right that is "stronger" than the common law right. U.S. v. Erie Cnty., N.Y., 763 F.3d 235, 239 (2d Cir. 2014). Determining whether the First Amendment right of access attaches requires considering "(a) whether the documents 'have historically been open to the press and general public' (experience) and (b) whether 'public access plays a significant positive role in the functioning of the particular process in question' (logic)." Id. (quoting Lugosch, 435 F.3d at 120.) If the First Amendment right of access attaches, documents "may be sealed only if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Erie, 763 F.3d at 239 (internal modifications omitted).

As both parties have failed to proffer the requisite legal and factual bases for their contention that sealing is essential to preserve these higher values, their applications are denied without prejudice to renewal within 21 days of the issuance of this Order. The Court shall respectfully direct the Clerk of Court to maintain the current sealed viewing level for the documents considered in the parties' motions to seal (see infra, at 38) pending the resolution of any timely filed renewed motion. All of the documents will be unsealed following the expiration of the 21-day period if no timely motion is filed.

Defendants' Rule 72(a) Objection

By letter dated July 14, 2021, the Law Firm Defendants requested that the Court set aside Magistrate Judge Fox's July 14, 2021, order (docket entry no. 274, the "Order") imposing sanctions on Defendants for failing to produce certain items of discovery, despite a separate court order requiring them to do so.  (See docket entry no. 276.)  They are joined in this request by Defendants Wachter (docket entry no. 282) and Rakamaric (docket entry no. 287). The Court is also in receipt of a second letter from the Law Firm Defendants, dated July 23, 2021, styled as a "supplement" to the July 14 letter, (see docket entry no. 277), as well as Plaintiff's response.  (See docket entry no. 288.)

Pursuant to 28 U.S.C.A. section 636(b)(1)(A), "[a] judge of the court may reconsider any [non-dispositive] pretrial matter . . . where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."  Id. (Westlaw current through P.L. 117-80).  If a party objects to a magistrate judge's order, "[t]he district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous and contrary to law."  Fed. R. Civ. P. 72(a).  "A magistrate judge's order is 'clearly erroneous' where 'on the entire evidence,' the district court is 'left with the definite and firm conviction that a mistake has been committed.'" E.E.O.C. v. Teamsters Local 804, 2006 WL 44023, at *1 (S.D.N.Y. Jan. 9, 2006) (internal quotation omitted).  "An order is 'contrary to law' when it 'fails to apply or misapplies relevant statutes, case law or rules of procedure.'"  Collens v. City of New York, 222 F.R.D. 249, 251 (S.D.N.Y. Jul. 12, 2004).  "The clearly erroneous standard of review is highly deferential, and magistrate judges are afforded broad discretion in resolving non-dispositive disputes and reversal is appropriate only if their discretion is abused."  E.E.O.C., 2006 WL 44023, at *1 (internal

quotation marks and citation omitted).  The fact that "reasonable minds may differ on the

wisdom of granting [a party's] motion is not sufficient to overturn a magistrate judge's

decision."  Edmonds v. Seavey, 2009 WL 2150971, at *2 (S.D.N.Y. Jul. 20, 2009) (internal

quotation marks and citation omitted).

"If a party . . . fails to obey an order to provide or permit discovery . . . the court

where the action is pending may issue further just orders."  Fed. R. Civ. P. 37(b)(2)(A).  "Instead

of or in addition to the orders [issued pursuant to Fed. R. Civ. P. 37(b)(2)(A)], the court must

order the disobedient party, the attorney advising the party, or both to pay the reasonable

expenses, including attorney's fees, caused by the failure, unless the failure was substantially

justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).

"Provided that there is a clearly articulated order of the court requiring specified discovery, the

district court has the authority to impose Rule 37(b) sanctions for noncompliance with that

order."  Daval Steel Rods., a Div. of Francosteel Corp. v. M/V Fakredine, 951 F.2d 1357, 1363

(2d Cir. 1991).  However, "the severity of the sanctions must be commensurate with the non-

compliance."  Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d 130, 140 (2d Cir. 2007).

> [I]n reviewing a sanctions order for abuse of discretion, courts
> properly consider various factors, including (1) the willfulness of
> the non-compliant party or the reason for noncompliance; (2) the
> efficacy of lesser sanctions; (3) the duration of the period of
> noncompliance; and (4) whether the non-compliant party had been
> warned of the consequences of noncompliance.

Funk v. Belneftekhim, 861 F.3d 354, 366 (2d Cir. 2017).

Here, the Court finds that Magistrate Judge Fox's Order entering sanctions against

Defendants was neither clearly erroneous nor contrary to law.  As Judge Fox noted, the Court's

July 9, 2020, order "directed 'the defendants' to 'provide to the plaintiff operational versions of

their software' and 'provide access to their server, as soon as practicable.'"  (See Order at 18

(citing docket entry no. 196).)  Magistrate Fox found that "[a]t no point did the defendants provide to the plaintiff an operational version of the alleged infringing software or access to the relevant server, as ordered by the Court on July 9, 2020."  Id.  The record indicates, and Defendants do not proffer to the contrary, that the Server and current version of the Rakamaric Software were not produced until after AMSI filed its application for sanctions.  (See docket entry no. 288 at 5.)  Further, the evidence was produced by Krantz, a non-party, rather than Defendants.  Id.

Nor does the Court find that the sanctions imposed were incommensurate with Defendants' non-compliance.  Rather than comply with the Court's Order, Defendants twice moved for protective orders to preclude, as "unnecessary and unduly burdensome," discovery of the very evidence directed for production and sought to quash Plaintiff's subpoena served on a non-party in pursuit of the same.  (See docket entry nos. 197 and 207.)  The record indicates that Defendants remained non-compliant with the Court's order for at least 8 months, if not longer.  (See docket entry no. 288) ("Not until a few months after AMSI formally moved for sanctions on February 18, 2021, . . . was an operational version of the accused software and the RHCR-APPSRV server produced by non-party Krantz.")  Magistrate Judge Fox declined to impose the most severe sanctions requested by AMSI, including striking Defendants' summary judgment motion and making extensive "adverse factual findings."  (See Order at 4-5.)  Instead, Judge Fox awarded attorney's fees and costs incurred by AMSI in seeking production of the discovery via subpoena and litigating motions concerning the same.  Id.  The Court finds that Judge Fox appropriately exercised the discretion allotted to him and issued sanctions commensurate with Defendants' non-compliance.  Accordingly, the Court finds no basis to disturb Judge Fox's Order.  Defendants' request is denied in its entirety.

<u>Plaintiff's Request to Move for Partial Summary Judgment</u>

Pursuant to Federal Rule of Civil Procedure 56(c), a summary judgment motion may be filed "at any time until 30 days after the close of all discovery" "unless a different time is set by local rule or the court orders otherwise." <u>Id.</u>  Here, Magistrate Judge Fox, following a series of extensions, established a deadline of October 5, 2020, for the parties to complete pretrial discovery, automatically making the deadline to move for summary judgment Nov. 4, 2020.  (<u>See</u> docket entry no. 203.)  Though the Court has discretion to strike, or deny leave to bring, a cross-motion for summary judgment when the moving party has not met the deadline for filing dispositive motions, the Court may decline to do so, and so declines in this instance.  <u>See</u> <u>Shantou Real Lingerie Manufacturing Co., Ltd. v. Native Group International, Ltd.</u>, 401 F.Supp.3d 433, 437 n. 3 (S.D.N.Y. Mar. 14, 2018) (citing precedent that "[c]ourts routinely permit[] litigants to file cross-motions in response to a dispositive motion, even though the deadline had passed").

Here, AMSI attributes its failure to timely move for summary judgment to Defendants' failure to provide needed discovery, in violation of a court order, until well after the deadline had elapsed.  (<u>See</u> docket entry no. 290) ("[D]iscovery was not then sufficiently complete to enable AMSI to move for summary judgment on its breach of contract claim . . . [f]or instance, AMSI previously had no ability to demonstrate all of its damages.")  New York law requires three elements to sustain a claim for breach of contract: (1) the existence of a contract; (2) breach; and (3) damages resulting from, or caused by, that breach.  <u>Diesel Props.</u> <u>S.R.L. v. Greystone Bus. Credit II LLC</u>, 631 F.3d 42, 52 (2d Cir. 2011).  Plaintiff argues that upon receipt of the Server, AMSI uncovered new evidence directly relevant to the damages element of its breach of contract claim.  (<u>See</u> docket entry no. 290 at 2.)

Defendants do not address Plaintiff's arguments directly, instead arguing, <u>inter alia</u>, that AMSI "obtained an order for sanctions under false pretenses" and that AMSI's proposed motion is "wholly without merit." (<u>See</u> docket entry no. 291, at 1-2.) The Court has upheld Magistrate Judge Fox's sanctions order, and notes that "considerations such as . . . the purported merits of the summary judgment motion need not be weighed" in determining the question of diligence. <u>Desir v. Austin</u>, 13-CV-00912-DLI-VMS, 2015 WL 4546625, at *3 (E.D.N.Y. Jul 28, 2015). Defendants also claim that, in its opposition to Defendants' motion for summary judgment, AMSI argued that "there existed material issues of facts on all claims." (<u>See</u> docket entry no. 291, at 2.) However, as Plaintiff notes in its Reply, Defendant sought summary judgment as to AMSI's breach of contract claim, "solely on pendent jurisdiction grounds" and "AMSI responded only on those grounds" and did not address "the merits of the breach of contract claim." (<u>See</u> docket entry no. 292; <u>see also</u> docket entry no. 238.)

A review of the record shows that AMSI served requests for the Server and Rakamaric Software in August 2019, sought and received a court order for this discovery on July 9, 2020, and served a subpoena upon a non-party to the action in pursuit of the discovery AMSI claims to have required to timely move for summary judgment. Plaintiff has shown that Defendants' failure to provide this discovery left them unable to reasonably meet the Nov. 4 deadline, despite their diligent efforts to obtain it. Accordingly, Plaintiff's request to move for partial summary judgment as to its claim for breach of contract against the Law Firm Defendants is granted. Plaintiff's motion must be filed within 28 days of the date of issuance of this Order.

CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (docket entry no. 217) is denied on all counts. Plaintiff's Federal Rule of Civil Procedure 56(d) motion (docket entry no. 233) is denied as moot. Plaintiff's motion to seal (docket entry no. 233) is denied without prejudice to renewal by 21 days from the date of entry of this Order. Defendants' motion to seal (docket entry no. 215) is also denied without prejudice to renewal by 21 days from the date of entry of this Order. The Court respectfully directs the Clerk of Court to maintain the current sealed viewing level for the documents filed under docket entries no. 216, 235, 238, 240, 254, and 256, pending the resolution of any timely filed renewed motion. All documents will be unsealed following the expiration of the 21-day period if no timely motion is filed. Defendants' letter motion (docket entry nos. 282, 288) requesting that the Court set aside Magistrate Judge Fox's award of sanctions is denied. Plaintiff's request for leave to file a motion for partial summary judgment (docket entry no. 290) is granted. Plaintiff's motion must be filed within 28 days of the entry of this Order.

This Memorandum Opinion and Order resolves docket entry nos. 215, 217, 233, 276, 282, and 290. Pretrial management of this case has been reassigned to Magistrate Judge Jennifer E. Willis, and this matter remains so referred.

SO ORDERED.

Dated: March 31, 2022
New York, New York

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge