UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

AUTOMATED MANAGEMENT
SYSTEMS, INC.,

        Plaintiff,

  -v-                                    No.   1:16-CV-04762-LTS-JW

RAPPAPORT HERTZ CHERSON
ROSENTHAL, P.C., WILLIAM
RAPPAPORT, STEVEN M. HERTZ, ELIOT
J. CHERSON, MICHAEL C. ROSENTHAL,
BRANKO RAKAMARIC, and BEN
WACHTER,

        Defendants.

-------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

Plaintiff Automated Management Systems, Inc. ("Plaintiff" or "AMSI") brings this action against Defendants Rappaport Hertz Cherson Rosenthal, P.C. ("RHCR"), RHCR's four named partners William Rappaport, Steven M. Hertz, Eliot J. Cherson, and Michael C. Rosenthal (collectively, the "Law Firm Defendants"), Branko Rakamaric ("Rakamaric"), and Ben Wachter ("Wachter") (collectively, the "Defendants"), asserting claims for copyright infringement, trade secret misappropriation under 18 U.S.C. section 1836 (the "Defend Trade Secrets Act" or "DTSA") and claims under common law for unfair competition, breach of contract (against RHCR), and tortious interference with a contract (against Defendants Rakamaric and Wachter). The Court has jurisdiction of Plaintiff's federal copyright infringement and DTSA claims pursuant to 28 U.S.C. sections 1331 and 1338 and has supplemental jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. section 1367.

AMSI and RHCR have cross-moved for partial summary judgment as to the breach of contract claim (see docket entry nos. 310, 319 (the "Pl. MSJ"), 345 (the "Def. MSJ")). Moving separately and pro se, Defendant Rakamaric filed a submission styled as a "Memorandum of Law for Review of Judge Willis Order [*sic*.] by District Judge Laura Swain" (docket entry no. 369 (the "Rakamaric Mot.")) (with the Pl. MSJ and Def. MSJ, the "Motions"), which appears to request reconsideration of an award of sanctions issued by then-assigned Magistrate Judge Kevin Fox (docket entry no. 274), for which Magistrate Judge Jennifer Willis subsequently determined the amount to be awarded (docket entry no. 368).

The Court has considered the submissions of all parties carefully and, for the following reasons, denies the Motions in their entirety.

BACKGROUND

Familiarity with the general context and procedural history of this case is assumed for the purposes of this Memorandum Opinion and Order. Here, the Court will provide an overview of the facts relevant to the instant motion practice. Unless otherwise indicated, the following facts are undisputed.

AMSI is a New York corporation that makes and licenses software products (see docket entry no. 170 ("Third Amended Complaint" or "TAC") ¶ 1), including a program called the Landlord Tenant Legal System ("LTLS," or the "AMSI Software"), which AMSI licensed on a month-to-month basis to RHCR, a landlord-tenant law firm, pursuant to a License Agreement, entitled the "Software Subscription Agreement," entered into on January 2, 2007. (See TAC at Exhibit C (the "Agreement").) The AMSI Software performed a number of functions for RHCR, including maintenance of tenancy information, generation of pre-litigation and litigation forms, and automatic creation of reports and email alerts. (Docket entry no. 347 ("Def. Counter-56.1

St.") ¶¶ 3-6.)  The License Agreement granted AMSI the right to "Use" the AMSI Software, which the Agreement defined as "storing, loading, installing, executing, or displaying the Software on a single device or series of devices, and use of the [AMSI] Software by way of End User's server, which allows use of the [AMSI] Software by all users in that environment." (Agreement § 1(b).)  The AMSI Software was stored in a server on RHCR's computer network called RHCR-NYAPP.  (Docket entry no. 325 ("Pl. 56.1 St.") ¶ 29.)

Five provisions of the Agreement—sections 2(d), 2(j), 2(h), 3(d), and 3(f)—are of particular relevance to the parties' cross-motions.  First, section 2(d) permits either party to terminate the "subscription and Software License on 60 days prior notice for failure to comply with any terms of this Agreement."  (Agreement § 2(d).)  Upon such termination, RHCR would "no longer have any right to Use the Software and AMSI shall, as such, be permitted to de-install the Software from [RHCR]'s computer system by remote access or other means."  (Id.)

Second, section 2(h) places limitations on copying of the Software.  Under its terms, RHCR:

> may only make a back-up copy of the software, if AMSI did not make available such copy, a disaster recovery location copy (DRL) and a copy on the web access server and with the specific understanding that End User is not permitted to maintain multiple copies of the software for redundant system protection without the written consent of AMSI.

(Agreement § 2(h).)

Third, section 2(j) governs the scope of AMSI's permitted remote access to RHCR's computer network.  In pertinent part, this section states that "AMSI access will be strictly related to AMSI's software files and will respect the confidentiality of other Clients [*sic*] files."  (Agreement § 2(j).)  This clause also provides for liquidated damages to AMSI if RHCR

denies AMSI access to its network.  (Id.)  This is the only portion of the Agreement that contemplates liquidated damages.  (Id.)

Fourth, section 3(d) governs acceptable uses of the AMSI Software.  It prohibits RHCR from accessing or misusing certain proprietary material contained within the AMSI Software:

> Customer may not modify, reverse engineer, disassemble, decompile, or otherwise attempt to access or determine the source code of the Software in any way in whole or in part or create a derivative work based on the software.  Any use of these materials in any other work environment or networked computer environment, including remote usage of the system, for any purpose is prohibited.  The software is copyrighted and unauthorized use of it is prohibited.  If Customer breaches any of these terms, the License to Use the Software automatically terminates and Customer must immediately destroy any installed or printed materials.

(Agreement § 3(d).)

Finally, section 3(f) requires RHCR to maintain the confidentiality of proprietary information in the AMSI Software.  Specifically:

> Customer agrees that Software contains proprietary information including trade secrets, know-how and confidential information that is the exclusive property of AMSI.  During the period this Agreement is in effect and at all times after its termination, [c]ustomer and its employees and agents shall maintain the confidentiality of this information and not sell, license, publish, display, distribute, disclose, or otherwise make available this information to any third party nor use such proprietary information concerning the Software, including any Database files, Source Code, Dynamic Link Libraries, Application Program Interfaces, user manuals and screens, to persons not an employee of Customer without the prior written consent of AMSI.

(Agreement § 3(f).)

The Agreement and license granted thereunder to RHCR remained in force through 2015, at which point the AMSI Software began to crash and freeze routinely (for a reason that the parties dispute), causing processing delays at RHCR.  (See docket entry no. 222

("Def. 56.1 St.") ¶ 10.) Around that time, RHCR contacted Rakamaric, a computer programmer, regarding installation of a new software platform (the "Rakamaric Software") to replace the AMSI Software, and an agreement to that effect was signed on October 1, 2015. (Id. ¶¶ 12-14.) Rakamaric retained Wachter to help develop and install the Rakamaric software. (Id. ¶ 23.) RHCR did not notify AMSI of this new agreement, and its Agreement with AMSI remained active. (See docket entry no. 237 ("First Pl. Counter-56.1 St.") ¶ 12.)

    To assist Rakamaric in developing the new Software, RHCR provided him with a server location on RHCR's network entitled RHCR-APPSRV. (Docket entry no. 222 ("First Def. 56.1 St.") ¶ 27.) At some point prior to the termination of the Agreement, Rakamaric copied a data folder from the RHCR-NYAPP server location to the RHCR-APPSRV server location. (Def. Counter-56.1 St. ¶ 57.) RHCR and Rakamaric claim that this copying was done for the sole purpose of extracting RHCR client data contained within the AMSI Software, without which RHCR would have been "blind as to current cases" and therefore unable to represent its clients. (Id. ¶ 57.) However, some additional data relating to the AMSI Software was also copied to RHCR-APPSRV. RHCR and Rakamaric claim that the additional copying was unintentional and was limited to twenty .asp scripts (the ".asp scripts") that were never utilized for any reason. (Id.) AMSI disputes this claim, contending that Rakamaric copied over 4,000 files to RHCR-APPSRV.[1] (Pl. 56.1 St. ¶ 52.) In support of its contention, AMSI provides numerous screenshots of the RHCR-APPSRV file directory. (Docket entry no. 235 ("Traina

---

[1]   The Court notes that Rakamaric makes direct reference to this figure in his declaration, stating that AMSI was "dissecting RHCR-APPSRV for 10 days where alert folder is [*sic*.] with 4000+ files where 95+% of them were useless .pdf files." (Docket entry no. 340 ("Second Rakamaric Decl.") ¶ 17.) The Court was unable to determine whether or not this amounts to a concession of AMSI's claimed figure.

Decl.") Ex. 33.)  In addition to what appear to be the .asp scripts, these screenshots show the presence of many other files in RHCR-APPSRV, which AMSI claims are copies of various components of the AMSI Software.[2]  (Traina Decl. ¶¶ 226-242, Ex. 33.)  Pointing to various email communications, AMSI claims that, whatever the extent of the copying, it was done at RHCR's direction.  (Pl. 56.1 St. ¶ 57.)  RHCR disputes this, conceding only that it directed extraction of RHCR's client data, and asserting that any other copying, to the extent it took place, was unknown to them and unauthorized.  (Def. 56.1 Counter-St. ¶ 57.)

AMSI asserts, and RHCR and Rakamaric deny, that, having provided Rakamaric with the RHCR-APPSRV development environment, RHCR then instructed Rakamaric and Wachter to "replicate the functionality" of the AMSI Software for the purpose of creating a derivative product.  (Pl. 56.1 St. ¶ 24; Def. Counter-56.1 St. ¶ 24.)  AMSI asserts, and RHCR and Rakamaric deny, that, in service of this goal, AMSI provided Rakamaric and Wachter "unfettered access" to the AMSI Software, and that Rakamaric and Wachter "extensively studied [the AMSI Software's] structure, function, operation, and user interface."  (Pl. 56.1 St. ¶¶ 30, 49.)

In support of its assertion that RHCR directed Rakamaric and Wachter to replicate the functionality of the AMSI Software, AMSI proffers emails sent by RHCR employees to Wachter and/or Rakamaric, in which AMSI claims RHCR "asked Defendants Rakamaric and Wachter to replicate various features of" the AMSI Software.  (Traina Decl. ¶ 131.)  In one such

---

[2]   In a prior affidavit describing the development of the Rakamaric Software's automated email function, Rakamaric stated that he attempted to convert "log datafiles of what was emailed by RHCR," and in doing so, came across "more than 4000 .pdf files . . . containing old firm emails and a few hundred of other files including more than 50 .asp files."  (Docket entry no. 216 ("First Rakamaric Aff.") ¶ 24.)  It is unclear whether these are the same files to which AMSI refers.

email, sent prior to the termination of the Agreement, an RHCR employee directs Rakamaric to adjust a "report to generate exactly like the one on page 2 [presumably an AMSI Software-generated report] with the information shown on page 2 and if we can send this information automated to him and other individuals that would be much better." (Traina Decl., Ex. 20 at 56.) Another, sent the previous day, directs Mr. Wachter to develop an alert for payments due "like the sample attached" with an attached report that was, presumably, AMSI Software-generated. (Id. at 92.) AMSI claims, and RHCR disputes, that this process resulted in certain outputs of the Rakamaric Software having "the same look and feel as the outputs generated by" the AMSI Software. (Pl. 56.1 St. ¶ 41.)

On May 27, 2016, James Traina ("Traina"), AMSI's President, was working to correct a problem in the AMSI software at RHCR and discovered the RHCR-APPSRV server. (Traina Decl. ¶ 121.) On June 9, 2016, AMSI terminated the License Agreement and disabled the AMSI Software, without prior notice to RHCR. (Pl. 56.1 St. ¶ 46; Def. 56.1 St. ¶ 46.) Between those two dates, Traina did not notify RHCR of his discovery, and he remotely accessed the RHCR-APPSRV server and investigated its contents over a period of approximately thirteen days. (Docket entry no. 339-1 ("Rappaport Reply Aff.") ¶¶ 17-19.) RHCR alleges that, "despite having discovered the RHCR-APPSRV server in May, AMSI accepted payment from RHCR for June 2016 and then waited to de-install the software after the June 2016 payment cleared their account." (Id. ¶ 28.) In their 56.1 statements filed in connection with the previous round of summary judgment motion practice in this case, AMSI confirmed that Traina discovered the alleged copies by looking through other locations on the RHCR network beyond the RHCR-NYAPP Server (where the AMSI Software was located) but claimed that AMSI had been granted permission to do so. (First Pl. Counter-56.1 St. ¶ 52.) ("AMSI was asked by the

Law Firm Defendants to help solve a problem and was not restricted in looking for a solution in the server dedicated to the AMSI Software.")  AMSI also disputes that it delayed disabling the AMSI Software for the purpose of accepting advance payment for an additional month of use. (Id. ¶ 53 ("Disputed. RHCR's check payment was for May 2016.").)

AMSI asserts, and RHCR denies, that, subsequent to termination, "RHCR re-installed and continued to access and use a backup version of [the AMSI Software] after AMSI terminated the license agreement."  (Pl. 56.1 St. ¶¶ 57, 61; docket entry no. 324 ("Second Traina Decl.") ¶ 9.)  AMSI grounds this assertion in its claim (which RHCR disputes) that a server produced by RHCR in discovery contained an "operational version" of the AMSI Software.  (Pl. 56.1 St. ¶ 60; Def. 56.1 ¶ 60.)  The Law Firm Defendants, Rakamaric, and Marianne Nunziata, an RHCR employee who is a non-party to the case, have each filed declarations denying that any re-installation took place.  (See Second Rakamaric Decl. ¶ 29; docket entry no. 341 ("Hertz Decl.") ¶¶ 8-9; docket entry no. 342 ("Nunziata Decl.") ¶ 7.)  Rakamaric also denies that the version of the AMSI Software on the server was operational, claiming that, because it had been disabled by AMSI, "a user would have gotten an error message" if they tried to access it. (Second Rakamaric Decl. ¶ 32.)  In another affirmation that includes several screenshots, Traina contends that the AMSI Software was re-installed and repeatedly accessed subsequent to termination of the Agreement.  (Docket entry no. 367 ("Third Traina Decl."), Exhibits A-D.)

From that additional "operational version" of the AMSI Software, AMSI provides a screenshot of what it claims is a "login file" (the "Login File") demonstrating that RHCR's "copy of AMSI's LTLS Software was repeatedly accessed by RHCR" from 2016 to 2019. (Second Traina Decl. ¶ 9.)  The Login File is a table, containing a series of user IDs, some of which correspond to names matching those of the Law Firm Defendants, as well as columns

labeled "Logdate" and "Logtime."  (Id.)  Under the "Logdate" column are eight dates, all subsequent to termination of the Agreement, scattered across 2016, 2017, and 2019.  (Id.) RHCR questions both the authenticity and the accuracy of the Login File and contends that it "proves nothing whatsoever because no one has continued to use the AMSI LTLS Software for any purpose following June 9, 2016."  (Def. Counter-56.1 St. ¶ 57.)

AMSI further asserts, and RHCR denies, that, since 2019, RHCR has continued to use the AMSI Software's "proprietary software technology and functionality . . . by incorporating it into the Rakamaric Software in violation of the License Agreement."  (Pl. 56.1 ¶ 72; Def. Counter-56.1 St. ¶ 72.)  AMSI asserts, and RHCR disputes, that "the similarities between [the AMSI Software and Rakamaric Software] are so extensive that the transition from AMSI's LTLS Software to the Rakamaric Software was totally unnoticeable to end-users."  (Pl. 56.1 St. ¶ 41; Def. 56.1 St. ¶ 41.)  Based on these allegations—that RHCR accessed and used the AMSI Software directly through 2019, and thereafter accessed its functionality indirectly via the Rakamaric Software—AMSI seeks damages in the amount of "$290,174, plus interest," an amount it asserts is equal to "continuing license fee damages" dating from June 9, 2016, to the date this action was filed.  (Pl. 56.1 ¶ 73.)

DISCUSSION

Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is considered material if it "might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Caladora v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (citation omitted). The nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted). However, in a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," Nieblas-Love v. N.Y.C. Hous. Auth., 165 F. Supp. 3d 51, 64 (S.D.N.Y. 2016) (citation omitted), and the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003) (citation and quotation marks omitted).

The same legal standards apply when analyzing cross-motions for summary judgment. Schultz v. Stoner, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted).

AMSI's Motion for Summary Judgment

Under New York law, a party seeking to prevail on a breach of contract claim must establish the following elements: "(1) the existence of a contract; (2) performance by the party seeking recovery; (3) non-performance by the other party; and (4) damages attributable to the breach." Intercept Pharm. v. Howard, 615 F. App'x 42, 43 (2d Cir. 2015) (citation omitted). To warrant summary judgment, AMSI must establish that there is no genuine dispute of material fact as to each of these elements and, from the undisputed factual record, that no reasonable jury

could find in favor of RHCR.  The Court finds that AMSI has failed to meet this burden as to the fourth element of its claim, and its motion for summary judgment is therefore denied.

    Damages

RHCR disputes that AMSI has established entitlement to damages, the fourth element of a breach of contract claim.  Under New York law, "[d]amages are an essential element of a breach of contract claim."  Tenor Opportunity Master Fund, Ltd. v. Oxygen Biotherapeutics, Inc., No. 11-CV-6067-KBF, 2012 WL 2849384, at *5 (S.D.N.Y. Jul. 11, 2012) (citation omitted); see also LNC Invs., Inc. v. First Fid. Bank, N.A. New Jersey, 173 F.3d 454, 465 (2d Cir. 1999) ("Under New York law . . . [t]he failure to prove damages . . . is fatal to [a] plaintiff's breach of contract cause of action." (footnote and internal quotation marks omitted)).  "This requires a showing that the damages were 'directly traceable to the breach, not remote or the result of other intervening causes.'"  Wilder v. World of Boxing LLC, 310 F. Supp. 3d. 426, 445-46 (S.D.N.Y. 2018) (quoting Wenger v. Alidad, 265 A.D.2d 322, 323 (2d Dep't 1999)).

AMSI premises its claimed entitlement to damages on a lost license fee, or "reasonable royalty," theory.  Under such a theory, which is used almost exclusively in the context of copyright law,[3] courts may award a royalty "for continued use of a product beyond authorization, and damages [are] measured by the license the parties had or contemplated."

---

[3] In its opposition, RHCR emphasizes the rarity of awarding reasonable royalty damages in a breach of contract action. (Docket entry no. 338 at 9 (correctly stating that AMSI "does not cite to any Second Circuit precedent where the Courts have adopted this theory of damages, applicable in Copyright cases, to a breach of [contract] claim.").)  AMSI, in its reply, argues without citation that "ongoing royalties under a license agreement [are not] a controversial or unusual measure of damages for breach of contract."  (Docket entry no. 366 at 2); but see In re KG Winddown, LLC, 632 B.R. 448, 483 (Bankr. S.D.N.Y. 2021) ("Although [the reasonable royalty] approach is primarily used in patent infringement cases, it is appropriate in breach of contract cases as well.").

Juicy Couture, Inc., v. L'Oreal USA, Inc., No. 04-CV-7203-DLC, 2006 WL 1359955, at *5 (S.D.N.Y. May 18, 2006) (citation omitted).  AMSI proposes two factual predicates for such a theory: (1) that RHCR improperly re-installed and continued to use the AMSI Software subsequent to Traina's termination of the Agreement, without paying the monthly license fee; and (2) that the Rakamaric Software is so thoroughly similar to the AMSI Software that, by using the Rakamaric Software, AMSI was allowed "to continue using the features of [the AMSI Software] after termination of the [Agreement]" without payment.  (Docket entry no. 323 ("Pl. Mem.") at 19.)

        AMSI's first theory fails at this summary judgment stage because it requires the court to credit one conflicting version of events over another.  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (quotation and citation omitted).  AMSI bases its theory of re-installation of the AMSI Software on its claimed discovery of an operational version of the AMSI Software on a hard drive produced in discovery by RHCR.  While it is undisputed that some version of the AMSI Software was produced in discovery by RHCR, both the operability of that software and the reason for its presence on the hard drive are subject to dispute, with declarants for each side proffering starkly different factual claims.  Similarly, AMSI asks the Court to find ongoing use of the AMSI Software by RHCR on the basis of the Login File, which shows eight entries in four years, and a series of screenshots accompanying AMSI's reply papers.  RHCR disputes the significance of the Login File and provides an alternative version of events in which the Login File could simply show inadvertent clicking on a preserved icon.  It is not for the Court, at the summary judgment stage, to credit one factual narrative over another, and the Court declines to do so here.

AMSI's second theory relies upon a different factual predicate—that the Rakamaric Software is both derivative of the AMSI Software and so similar to it that RHCR's use of the former is effectively uncompensated use of the latter—that similarly fails because its premise is subject to genuine dispute. In one representative example, AMSI proffers screenshots of the "Warrant Processing List" screen generated by both programs to demonstrate the similarity between the two. (Traina Decl. at Exhibit 4H.) However, RHCR does the same, but in its proffer, the Rakamaric Software's "Warrant Processing List" screen looks substantially different. (Traina Decl. at Exhibit 4H.) In a prior order, the Court noted a similar inconsistency in the parties' proffered comparisons of the "Upcoming Trial" email alerts generated by the two programs. (See docket entry no. 302 at 17.) Generally, AMSI and RHCR dispute whether, as a matter of fact, the AMSI and Rakamaric Software "differ significantly" (Def. Counter-56.1 St. ¶ 41.), or whether their similarities are "so extensive" that a transition between the two is "totally unnoticeable to end-users." (Pl. 56.1 St. ¶ 41). This constitutes a genuine dispute of material fact that the Court cannot resolve at the summary judgment stage.

Genuine disputes of material fact thus remain as to the fourth element of AMSI's breach of contract claim. For these reasons, AMSI's motion for summary judgment is denied.

RHCR's Cross-Motion for Summary Judgment

RHCR cross-moves for summary judgment as to "AMSI's breach of contract claims that are premised on allegations of unauthorized copying, making unauthorized derivative works, and reinstalling the [AMSI] Software." (Docket entry no. 338 ("Def. Mem.") at 20.) RHCR argues that such claims are preempted by the Copyright Act. (Id.) "The Copyright Act exclusively governs a claim when (1) the particular work to which the claim is being applied

falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and § 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106." Universal Inst. Corp. v. Micro Sys. Eng'r, Inc., 924 F.3d 32, 48 (2d Cir. 2019).  Because the Copyright Act does not preempt claims which require an additional element, RHCR's motion fails.

Here, the legal right that AMSI seeks to vindicate in its breach of contract claim is not coextensive with copyright protections because AMSI's claim requires the additional element of damages.  "A state law right is equivalent to one of the exclusive rights of copyright if it may be abridged by an act which, in it of itself, would infringe one of the exclusive rights [conferred by copyright].  But if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, there is no preemption." Forest Park Pictures v. Universal Television Network, Inc., 683 F.3d 424, 430 (2d Cir. 2012) (internal citations and quotation marks omitted) (emphasis added).  In Forest Park Pictures, the Court specifically held that, when a contract includes a promise to pay for the copyright material, the claim includes additional element that prevents preemption of the claim by federal copyright law.  "A claim for breach of contract including a promise to pay is qualitatively different from a suit to vindicate a right included in the Copyright Act and is not subject to preemption." Id. at 433.[4]  Under the terms of the Agreement, RHCR promised to pay for its license to use the AMSI Software.  Because AMSI seeks to vindicate

---

[4] It is true that the holding in Forest Park Pictures was narrowed by Universal Instruments, in which the Second Circuit explained that, if the breach alleged is based on rights stemming from copyright rather than those explicit in the contract itself, then the claim seeks to vindicate exclusive rights under copyright law, and therefore cannot be brought as a breach of contract claim.  924 F.3d at 49).  AMSI's claims are brought pursuant to explicit provisions of the Agreement, and Universal Instruments therefore does not mandate preemption.

rights under the Agreement and these rights include a promise to pay, AMSI's claims for breach of contract are not preempted by federal copyright law. RHCR's motion for partial summary judgment is denied.

Rakamaric "Motion for Review"

Rakamaric, moving pro se, has filed a pleading, styled a "motion for review," asking the Court to "evaluate magistrate judge Jennifer E. Willis order to recoup legal fees for sanctions from Mr. Rakamaric." (Docket entry no. 369 ("Rakamaric Mot.") at 3.) The motion is denied.

Although the Rakamaric Motion purports to request review of an order by Judge Willis (docket entry no. 368 (the "Willis Order")), directing the Defendants pay $19,760 to AMSI in attorney's fees, the Rakamaric Motion substantively seeks reconsideration of a separate order: a sanctions determination made in AMSI's favor by Magistrate Judge Fox (docket entry no. 274 (the "Fox Order")), and subsequently upheld by this Court (docket entry no. 302 at 33). In the Fox Order, the Court directed AMSI to request reasonable attorneys' fees and costs for which all defendants, including Rakamaric, were jointly and severally liable. (Fox Order at 21.) The Willis Order subsequently determined the amount of the sanctions award granted to AMSI by the Fox Order. As the Court noted at the time (in response to a similar application by Rakamaric (docket entry no. 346)), the Willis Order exclusively considered the amount of the award granted by the Fox Order. (Willis Order at 9 ("As to Rakamaric, the present application is solely for attorneys' fees. Judge Fox previously held that sanctions were appropriate against Rakamaric.").) As Rakamaric is seeking review of the Court's determination in the Fox Order, the Court will construe the Rakamaric Motion as a motion for reconsideration.

A motion for reconsideration is permissible upon "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Mikhaylova v. Bloomingdale's, Inc., No. 19-CV-8927-GBD-SLC, 2022 WL 17986122, at *2 (S.D.N.Y. Dec. 29, 2022). As no such circumstances are present here, Rakamaric's motion for reconsideration is denied.

## CONCLUSION

For the foregoing reasons, AMSI's motion for summary judgment is denied. RHCR's motion for summary judgment is denied. Rakamaric's motion for review is also denied.

This Memorandum Opinion and Order resolves docket entry nos. 310, 319, 345, and 369. This case remains referred to Magistrate Judge Jennifer E. Willis for general pretrial management. The parties must promptly contact Judge Willis' chambers to request a settlement conference and to address what, if any, pretrial matters remain outstanding if settlement of all outstanding issues cannot be achieved. The parties are further directed to file a joint status report by November 6, 2023, stating whether they expect to proceed to trial. The final pretrial conference is adjourned to January 5, 2024, at 11:30 am in Courtroom 17C.

SO ORDERED.

Dated: New York, New York
September 19, 2023

/s/ **Laura Taylor Swain**
LAURA TAYLOR SWAIN
Chief United States District Judge